## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PAUL L. MUSSI,             )
                              )
           Plaintiff       )
                              )     **2:09cv1218**
      v.                       )     **Electronic Filing**
                              )
**MICHAEL J. ASTRUE**,      )
Commissioner of Social Security,  )
                              )
          Defendant     )

## OPINION

### I.   INTRODUCTION

Paul L. Mussi ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 ("the Act"). This matter comes before the court on cross-motions for summary judgment. (Docket Nos. 7, 11). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment will be granted and Defendant's Motion for Summary Judgment will be denied.

### II.   PROCEDURAL HISTORY

Plaintiff filed for DIB on June 1, 2006, claiming an inability to work as of June 29, 2003. (R. at 104).[1] Plaintiff initially was denied DIB on June 27, 2007. (R. at 60 - 63). A hearing was scheduled for August 15, 2008. Plaintiff, represented by counsel, appeared and testified. (R. at 20, 84 - 88). A vocational expert, Alina M. Kurtanich, also testified. (R. at 20). The ALJ issued his decision on October 17, 2008. (R. at 7 - 19). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which was denied on July 10, 2009, thereby making the

---

[1] Citations to Docket. Nos. 5 - 5-8, the Record, *hereinafter*, "R. at __."

decision of the ALJ the final decision of the Commissioner. (R. at 1 - 3).

Plaintiff filed his Complaint on September 8, 2009.  Defendant filed his Answer on November 13, 2009.  Cross-motions for Summary Judgment followed.

## III.  STATEMENT OF THE CASE

### A. General Background

Plaintiff was born April 29, 1969, and was 39 years of age at the time of the hearing. (R. at 28).  As of June 1, 2007, Plaintiff had served in the United States military for fourteen years. (R. at 240).   He served a tour of duty in the Persian Gulf from 1990 to 1991. (R. at 246).  He served a second tour of duty in Iraq from 2003 to 2004. (R. at 246).  While serving in Iraq, Plaintiff was involved in four improvised explosive device ("IED") attacks and injured his left shoulder. (R. at 240).  During combat training in 2006, Plaintiff re-injured his left shoulder. (R. at 240).

After his second tour of duty, Plaintiff attended college at Edinboro University for a degree in criminal justice. (R. at 240).  He dropped out of college. (R. at 240).  In 2006 Plaintiff was dismissed from a stint in officer training school. (R. at 240).

Plaintiff currently lives with his spouse. (R. at 241).  He has a child by a previous marriage who lives in North Carolina. (R. at 241).  Plaintiff and his wife reside on a farm in northwestern Pennsylvania. (R. at 405).

### B. Medical Background - Physical

On January 19, 2006, Plaintiff was examined at Martin Army Community Hospital for complaints of shoulder pain. (R. at 201).  Plaintiff complained of pain of sudden onset, that worsened with activity and movement of the arm above shoulder level. (R. at 201).  Plaintiff also complained that his shoulder often felt stiff, out of place, and unstable. (R. at 201).  The hospital notes indicated no signs of psychological issues, no decreased functioning ability, no unusual sleep complaints or tiredness, and normal enjoyment and interest in activities. (R. at 201).  Plaintiff appeared alert, well-developed, well-nourished, and in no acute distress. (R. at 202).  Physical examination of the left shoulder revealed evidence of tissue injury and contusion of the

left deltoid region. (R. at 202). Some swelling and deformity was noted, as well as a lessened range of motion and pain during movement. (R. at 202). However, there was no pain on palpitation, no atrophy, normal shoulder abduction, normal shoulder extension, and normal internal rotation of the shoulder. (R. at 202). Plaintiff was provided medication and a brace. (R. at 202). Plaintiff's shoulder condition was attributed to combat training. (R. at 202). A January 19, 2006, radiology report on Plaintiff's shoulder revealed that Plaintiff's bones, joints, and soft tissues were normal. (R. at 205). There was no evidence of fracture or dislocation. (R. at 205). Plaintiff's left shoulder was considered normal. (R. at 205).

Plaintiff was again seen at Martin Army Community Hospital on January 24, 2006 for complaints of left shoulder pain. (R. at 199). The examiner noted Plaintiff's normal radiology examination results from January 19, 2006. (R. at 199). Plaintiff reported that pain in his shoulder had decreased since his last visit. (R. at 199).

On February 7, 2006, Plaintiff was examined at Martin Army Community Hospital for his left shoulder. (R. at 197). Plaintiff again appeared to be in no acute distress, was well-developed, and well-nourished. (R. at 197). The hospital notes indicate that there was some weakness in the left shoulder, though there was full range of motion and no instability. (R. at 197). Some swelling, joint pain, and stiffness were observed, as well as a popping sound, some clicking, and a grating sensation. (R. at 197). The examiner noted Plaintiff's normal radiology results, and diagnosed the condition as a left shoulder strain. (R. at 197). Medication was prescribed. (R. at 197).

Plaintiff was last seen at Martin Army Community Hospital for his left shoulder pain on February 21, 2006. (R. at 195). Plaintiff appeared awake, alert, oriented, well-developed, well-nourished, hydrated, healthy, and active, and exhibited no signs of acute distress or discomfort. (R. at 195). Plaintiff's unremarkable radiology results were noted, and Plaintiff was again diagnosed with shoulder strain. (R. at 195).

Plaintiff had an x-ray of his left shoulder taken at the Erie V.A. Medical Center on March 31, 2006. (R. at 214). The x-ray showed normal bone density, without significant degenerative changes, and no loose bodies or soft tissue calcifications. (R. at 214). The hospital concluded

that Plaintiff's results were normal. (R. at 214). Lawrence J. Galla, D.O., examined Plaintiff that same day and noted that flexion and extension of the left shoulder were normal. (R. at 353). Abduction caused Plaintiff some discomfort, as did touching the back of his neck. (R. at 353). Dr. Lawrence concluded that Plaintiff suffered from arthralgia of the left shoulder. (R. at 353).

Another x-ray of Plaintiff's left shoulder at the Erie V.A. Medical Center on October 20, 2006, showed that Plaintiff's shoulder had minor abnormalities. (R. at 213). The radiology report noted that there was a focal bony irregularity on the clavicle that could have represented post-traumatic, and possibly degenerative, change. (R. at 213). However, glenohumeral relationship appeared normal, and there was no rotator cuff calcification. (R. at 213). At an orthopedic consult that same day, Plaintiff was noted as appearing healthy and in no acute distress. (R. at 312). Plaintiff's left shoulder showed some prominence of the distal clavicle, as well as crepitus and instability with compression of the distal clavicle; these abnormalities were credited with causing Plaintiff's pain. (R. at 314). There were no signs of loose bodies or calcification, and there were no signs of rotator cuff tear or labral tear. (R. at 314). Plaintiff had full strength in his left shoulder. (R. at 314). Plaintiff was injected with cortisone that subsequently provided excellent pain relief. (R. at 314).

Electromyography ("EMG") was performed on January 29, 2007, for carpal tunnel syndrome, and showed that Plaintiff suffered from a minimal degree of carpal tunnel in the wrists. (R. at 210 - 11). On February 16, 2007, Plaintiff had an x-ray of his spine taken at the Erie V.A. Medical Center. (R. at 212). The x-ray showed satisfactory lumbar spinal alignment, no vertebral bodies, and no fractures. (R. at 212). Plaintiff's intervertebral disc spaces were normal, and there were no signs of spondylolysis or spondylolisthesis. (R. at 212). An "incidental note" of spina bifida occulta at the L5 vertebrae was made. (R. at 212). However, Plaintiff's spine was diagnosed as having only minor abnormality. (R. at 212).

On February 16, 2007, Plaintiff was seen by Harvey P. Insler, M.D., at the Erie V.A. Medical Center for complaints of shoulder pain and numbness in the hands. (R. at 288). A radiology study revealed multiple small fractures in both hands. (R. at 288). However, an EMG study for carpal tunnel syndrome showed that both hands were only mildly affected. (R. at 288).

Dr. Insler acknowledged Plaintiff injured his left shoulder while serving in the military, but noted that recent magnetic resonance imaging ("MRI") of the shoulder showed no problems. (R. at 288). Surgery was not recommended. Dr. Insler prescribed night splints for Plaintiff's carpal tunnel syndrome and suggested taking over-the-counter medications to relieve pain. (R. at 288). He also recommended Plaintiff modify his activities to avoid pain. (R. at 288).

Plaintiff was evaluated on May 31, 2007, by physical therapist Bobby Letzo, P.T., for traumatic brain injury and back pain. (R. at 238). Mr. Letzo noted that Plaintiff's chief complaints were low back pain, ear pressure, and nausea. (R. at 238). During the evaluation, Mr. Letzo found that Plaintiff's impulsiveness and disinhibition were a result of behavioral issues, and not necessarily a traumatic brain injury. (R. at 238 - 39). Plaintiff did not exhibit other signs of traumatic brain injury such as balance dysfunction, apraxia, ataxia, dysdiadokokinesia, diminished coordination, or weakness. (R. at 239). Mr. Letzo felt that physical therapy may be able to relieve Plaintiff's back pain. (R. at 239).

An MRI study of Plaintiff's brain was completed on June 1, 2007, at Saint Vincent Health Center. (R. at 245). The MRI showed no abnormality. (R. at 245). Michael Orinick, M.D. examined Plaintiff on October 1, 2007 for a follow up on his earlier assessment for traumatic brain injury. (R. at 418). A neuropsychological evaluation showed that Plaintiff did not meet the physical criteria for traumatic brain injury and did not suffer from cognitive dysfunction. (R. at 418). Plaintiff was considered to be suffering primarily from issues related to depression, anxiety, mood disturbance, and post-traumatic stress disorder[2] ("PTSD"). (R. at 418).

*C. Medical Background - Psychological*

Plaintiff received psychotherapy and medication from the Eric V.A. Medical Center.

---

2

PTSD is the development of "characteristic symptoms following exposure to an extreme traumatic stressor." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV) 424 (4th ed. 1994). Traumatic events leading to the onset of PTSD include military combat. *Id.* Intense fear, hopelessness, and/ or horror is often experienced. *Id.* Persistent re-experience of the traumatic events leading to PTSD are often suffered in the form of recurrent, intrusive recollections, distressing dreams, and dissociative states that can last for days. *Id.* The PTSD sufferer will experience persistent anxiety and arousal, often leading to difficulty sleeping, hypervigilance, exaggerated startle responses, increased irritability, outbursts of anger, and difficulty concentrating and completing tasks. *Id.* at 425.

Over a period of time spanning 2006 to 2008, Plaintiff was treated by a number of medical professionals at the center. On May 22, 2006 Plaintiff had an initial evaluation with a behavioral science specialist, Mark A. Steg, M.S. (R. at 344 - 49). Mr. Steg determined that Plaintiff suffered from PTSD and depression. (R. at 344 - 49). During the initial evaluation, Mr. Steg noted that Plaintiff's grooming was appropriate, he was oriented, cooperative, and congenial, his speech was anxious but logical, his affect was appropriate, there were no signs of thought disorder, and he showed fair insight and judgment. (R. at 344 - 49). However, he appeared to have difficulty maintaining composure throughout the session. (R. at 347). Plaintiff was assessed a global assessment of functioning ("GAF") score of 50.[3] (R. at 344 - 49). Mr. Steg concluded that Plaintiff's social, cognitive, and affective dysfunction rendered him unemployable. (R. at 348).

Mr. Steg conducted Plaintiff's psychotherapy from June 12, 2006 until July 19, 2006, when Plaintiff switched psychotherapists. (R. at 322 , 331). Plaintiff was treated for PTSD and depression during these sessions. (R. at 322, 331). Mr. Steg generally noted that Plaintiff was anxious, and acted disproportionately cheerful to hide his anxiety. (R. at 322, 331). Plaintiff generally exhibited regular speech patterns, maintained his appearance appropriately, exhibited fair judgment, and was intelligent and motivated. (R. at 322, 331). However, Mr. Steg noted that Plaintiff's PTSD and depression worsened when confronted with the reality of his health, financial, and employment situations. (R. at 322, 331).

Plaintiff began seeing Carol L. Teresi, C.R.N.P., for prescription medication maintenance

---

[3]

The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* 24 (DSM-IV-TR) (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

on June 2, 2006. (R. at 327). Ms. Teresi monitored the effectiveness of Plaintiff's psychiatric medications for his PTSD and depression. (R. at 327). At their initial meeting, Ms. Teresi found Plaintiff's appearance to be neat and clean, he was fairly relaxed, he exhibited regular speech patterns, he thought logically, and he was oriented. (R. at 327). Nevertheless, she noted that Plaintiff suffered from significant PTSD symptoms, including hyper-vigilance and "fighting mode." (R. at 327). Plaintiff's mood and impulse control were down, his cognition was impaired, and his judgment and insight were limited. (R. at 327). Ms. Teresi believed that Plaintiff's symptoms were likely to impair his relationships and limited his ability to work. (R. at 327).

Ms. Teresi continued to meet with Plaintiff and monitor his medications through June 18, 2007. (R. at 258). Ms. Teresi frequently found that Plaintiff was dressed neatly and cleanly, was relaxed and open, was oriented, exhibited regular speech patterns, showed logical thought processes, and had good cognition, impulse control, insight, and judgment. (R. at 258, 263, 277, 294, 299, 308-18, 325). However, these findings often fluctuated greatly depending upon the severity of the PTSD and depression suffered by Plaintiff over the course of Ms. Teresi's evaluations. (R. at 258, 263, 277, 294, 299, 308 - 18, 325). Plaintiff's marital, health, and financial problems often were enhanced by, and also enhanced, Plaintiff's PTSD and depression symptoms. (R. at 258, 263, 277, 294, 299, 308 - 18, 325). Ms. Teresi stressed the need to try to stabilize Plaintiff's mood. (R. at 309). Plaintiff was assessed a GAF score of 50 by Ms. Teresi in an October 27, 2006, evaluation. (R. at 310).

Ms. Teresi's findings with respect to Plaintiff's mental state improved somewhat over the course of her evaluations. (R. at 258, 263, 277, 294, 299, 308 - 18, 325). In her final meeting with Plaintiff on June 18, 2007, Ms. Teresi noted that Plaintiff appeared to be responding favorably to a recent medication change, as his energy and ability to concentrate had improved. (R. at 258). Plaintiff continued to need help controlling agitation. (R. at 258). Ms. Teresi recommended Plaintiff try an additional medication to calm him down. (R. at 258).

Following psychotherapy treatment with Mr. Steg, Plaintiff began visiting Andre Shreve-Neiger, Ph.D., on December 12, 2006. (R. at 302). During his initial evaluation by Dr. Shreve,

Plaintiff was assessed a GAF score of 62. (R. at 62). Dr. Shreve noted that Plaintiff was of high average intelligence, and was open, cooperative, and motivated to get better. (R. at 302). However, Plaintiff suffered from intrusive traumatic memories, was easily startled, was hyper-vigilant, had stunted emotional expression, and felt isolated, detached, and guilty, as a result of PTSD and depression. (R. at 302). Dr. Shreve observed that Plaintiff was well-nourished, was neat and exhibited adequate hygiene, made good eye contact, was oriented, spoke normally, had a dysthymic mood, had intact judgment, and exhibited no signs of thought disorder. (R. at 302).

Plaintiff had numerous psychotherapy sessions with Dr. Shreve through September 5, 2007. (R. at 420, 424). Plaintiff was often described as exhibiting euthymic mood, mood-congruent affect, adequate hygiene, and good eye contact. (R. at 302, 298, 296, 292 - 91, 286 - 81, 266, 432, 430, 420, 424). Plaintiff generally communicated well and was usually in no acute distress. (R. at 302, 298, 296, 292-91, 286-81, 266, 432, 430, 420, 424). As was noted by Ms. Teresi, Plaintiff often struggled because his continual difficulties with work, an unstable and emotionally charged relationship with his wife, PTSD, and depression often fed off of one another. (R. at 302, 298, 296, 292 - 91, 286 - 81, 266, 432, 430, 420, 424). At one point, Plaintiff secured employment, but did not start because he believed his psychological condition would prevent him from performing successfully. (R. at 283).

In his final sessions with Plaintiff, Dr. Shreve opined that Plaintiff appeared to be fairing better in terms of mood and anxiety, and that his psychological condition was responding to medication. (R. at 266). Plaintiff's relationship with his wife also seemed to stabilize. (R. at 266). At his second to last session on August 8, 2007, Dr. Shreve noted that Plaintiff was especially communicative and insightful. (R. at 430). Yet, at his September 5, 2007 session with Dr. Shreve, Plaintiff became particularly angry and defensive towards Dr. Shreve when he was informed that Dr. Shreve would be terminating the therapeutic relationship because of a job change the following month. (R. at 425). Plaintiff stated that he wished to terminate their sessions the same day, and not continue through October. (R. at 425). Dr. Shreve noted that despite some apparent progress in his preceding session, Plaintiff now appeared to be regressing, and left therapy on bad terms. (R. at 425).

Plaintiff continued psychotherapy with Erma Watt, C.R.N.P., after Dr. Shreve left. (R. at 415, 420, 424). In her first session, Ms. Watt noted that Plaintiff was frustrated, angry, and depressed. (R. at 415). He told Ms. Watt that unless his financial situation improved, he did not know how he would be able to change his psychological condition positively. (R. at 415). Otherwise, Plaintiff exhibited a wide range of affect, a neat and clean appearance, a relaxed and open demeanor, appropriate behavior, and ease of communication. (R. at 415).

Plaintiff's last visit with Ms. Watt was on February 26, 2008. (R. at 402). He generally exhibited euthymic mood, a range of affect, logical thought processes, a neat and clean appearance, relaxed and appropriate behavior, and the ability to develop a good rapport. (R. at 415, 413, 407, 404, 402). Plaintiff's psychological state did fluctuate, and he often suffered from intrusive traumatic memories, anger, irritation, avoidance behaviors, hypersomnia[4], anhedonia[5], poor sleep, poor concentration, lack of energy, and an unstable relationship with his wife. (R. at 402, 404, 407, 413- 15). On January 22, 2008, Ms. Watt assessed Plaintiff a GAF score of 59. (R. at 404). At the last therapy session, she noted that Plaintiff had ceased taking his medication because it made him sleep too much. (R. at 402).

Over the course of his psychological and psychiatric treatment at the V.A., Plaintiff was prescribed a wide range of medications at varying doses that were adjusted frequently in an effort to control his PTSD, anxiety, depression, and other related problems/symptoms. These drugs

---

[4]

"Hypersomnia is characterized by recurrent episodes of excessive daytime sleepiness or prolonged nighttime sleep. Different from feeling tired due to lack of or interrupted sleep at night, persons with hypersomnia are compelled to nap repeatedly during the day, often at inappropriate times such as at work, during a meal, or in conversation. These daytime naps usually provide no relief from symptoms. Patients often have difficulty waking from a long sleep, and may feel disoriented. Other symptoms may include anxiety, increased irritation, decreased energy, restlessness, slow thinking, slow speech, loss of appetite, hallucinations, and memory difficulty. Some patients lose the ability to function in family, social, occupational, or other settings. . . Medical conditions including . . . depression . . . may contribute to the disorder." *National Institute of Neurological Disorders and Stroke: National Institutes of Health*, http://www.ninds.nih. gov/disorders/ hypersomnia/hypersomnia.htm (last visited September 10, 2010).

[5]

Anhedonia is the "absence of pleasure from the performance of acts that would ordinarily be pleasurable." *WebMD*, http://dictionary.webmd.com/terms/anhedonia (last visited September 10, 2010).

included: Butalbital[6], Celexa[7], Depakote[8], Effexor[9], Hydroxyzine[10], Prozac[11], Tegretol[12],

---

[6]

"Butalbital is a sedative that helps to decrease anxiety and cause sleepiness and relaxation." *WebMD*, http://www.webmd.com/drugs/drug-19843-Butalbital+Compound+Oral.aspx?drugid=19843&drugname=Butalbital+Compound+Oral&source=1(last visited September 10, 2010).

[7]

"Celexa is an orally administrered selective serotonin reuptake inhibitor (SSRI) with a chemical structure unrelated to that of other SSRI's or of tricyclic, tetracyclic, or other available antidepressant agents." *Physician's Desk Reference* 1176 (61st ed. 2007). "Celexa is indicated for the treatment of depression." *Id.* at 1177.

[8]

"Depakote is indicated for treatment of manic episodes associated with bipolar disorder. A manic episode is a distinct period of abnormally and persistently elevated, expansive, or irritable mood." *Physician's Desk Reference* 429, 436 (61st ed. 2007).

[9]

"Effexor is a structurally novel antidepressant for oral administration." *Physician's Desk Reference* 3411 (61st ed. 2007). "Effexor is indicated for the treatment of major depressive disorder." *Id.* at 3412.

[10]

Hydroxyzine is indicated for use in treatment of various conditions, including anxiety. *U.S. National Library of Medicine, National Institutes of Health*, http://www.ncbi.nlm.nih.gove/pubmedhealth/PMH0000796 (last visited September 13, 2010).

[11]

"Prozac is a psychotropic drug for oral administration." *Physician's Desk Reference* 1801 (61st ed. 2007). "Prozac is indicated for the treatment of major depressive disorder . . . obsessive compulsive disorder . . . bulimia nervosa . . . [and] panic disorder." *Id.* at 1803.

[12]

"Tegretol, carbamazepine USP, is an anticonvulsant and specific analgesic for trigeminal neuralgia." *Physician's Desk Reference* 2295 (61st ed. 2007).

Trazodone[13], Wellbutrin[14], Valproic Acid[15], and Zoloft[16].

Rosemary C. Buzzard, C.N.R.P., began to oversee the management of Plaintiff's medications on September 5, 2007. (R. at 421-23). Ms. Buzzard noted Plaintiff showed minimal responsiveness to medication. (R. at 423).

On May 31, 2007, Plaintiff underwent a speech, language, and cognitive evaluation with Lorri MacIsaac, M.S. (R. at 231). Plaintiff reported that he had recently been experiencing memory loss, difficulty concentrating, and hearing loss in noisy areas. (R. at 231). Following the evaluation, Ms. MacIsaac concluded that Plaintiff's hearing was within the normal range, but that he did exhibit hearing loss at high frequency. (R. at 232). Plaintiff had no difficulties with orientation. (R. at 232). In terms of problem-solving and reasoning, Plaintiff was mildly deficient. (R. at 232). He also had difficulty with simple, non-verbal tasks, and with complex verbal and nonverbal reasoning. (R. at 232).

Ms. MacIsaac determined Plaintiff showed definite difficulty with respect to maintaining attention and coping with distractions. (R. at 232 - 33). Plaintiff was assessed as being in the fifty percent range when completing attention-testing tasks. (R. at 233). Plaintiff was also moderately deficient with respect to memory, particularly his recent and short-term memory. (R. at 233). Plaintiff's speech production was mildly deficient. (R. at 233). Ms. MacIsaac found he

---

[13]

Trazodone "is used to treat depression. Trazodone works by helping to restore the balance of a certain natural chemical (serotonin) in the brain." *WebMD*, http://www.webmd.com/drugs/drug-11188-Trazodone+ Oral.aspx?drugid=11188&drugname=Trazodone+Oral&source=2 (last visited September 13, 2010).

[14]

"Wellbutrin, an antidepressant of the aminoketone class, is chemically unrelated to tricyclic, tetracyclic, selective serotonin reuptake inhibitor, or other known antidepressant agents." *Physician's Desk Reference* 1603 (61st ed. 2007). "Wellbutrin is indicated for the treatment of major depressive disorder." *Id.* at 1604.

[15]

"Depakene (valproic acid) is indicated as monotherapy and adjunctive therapy in the treatment of patients with complex partial seizures that occur either in isolation or in association with other types of seizures." *Physician's Desk Reference* (61st ed. 2007) at 418.

[16]

"Zoloft is a selective serotonin reuptake inhibitor for oral administration." *Physician's Desk Reference* 2586 (61st ed. 2007). "Zoloft is indicated for the treatment of major depressive disorder . . . obsessive compulsive disorder . . . panic disorder . . . post traumatic stress disorder . . . premenstrual dysphoric disorder . . . [and] social anxiety disorder." *Id.* at 2588.

had difficulty finding the correct word to describe or identify objects, and sometimes incorrectly substituted one word for another. (R. at 233). Plaintiff was also noted as exhibiting difficulty with executive functions such as planning, decision-making, time management, and organization. (R. at 233). Ms. MacIsaac recommended that Plaintiff seek speech therapy, and focus upon addressing deficits in memory, attention, executive function, and word retrieval. (R. at 233).

Following his session with Ms. MacIsaac, Plaintiff was evaluated by an occupational therapist, Michelle Mioduszewski, M.S. (R. at 234). Ms. Mioduszewski noted that Plaintiff was well-dressed, clean, and groomed, and exhibited no signs of difficulty with independent living skills. (R. at 234). Plaintiff was within functional limits with respect to range of motion, sensation, gross motor control, and fine motor control in his bilateral upper extremities. (R. at 234).

Ms. Mioduszewski determined that Plaintiff's visual skills were within functional limits for distance and peripheral vision, as was his tolerance for light. (R. at 235). However, his visual perception skills were in the low average range, and his visual motor assessment indicated personality disturbance. (R. at 235). In terms of cognition and executive functioning, Plaintiff was found to have difficulty maintaining attention when there were multiple distractions. (R. at 235). Plaintiff's had a significant deficit in impulse control. (R. at 235). Planning and organizational skills were also found to be lacking. (R. at 236). Plaintiff was found to exhibit frustration with more complex tasks. (R. at 236). Ms. Mioduszewski observed that Plaintiff was alert and compliant throughout the evaluation, though significant thoughts of aggressive behavior were noted. (R. at 236).

Ms. Mioduszewski concluded that Plaintiff was within the normal limits of daily living and independent functioning. (R. at 236). Plaintiff's bilateral upper extremities were normal, except that his left upper extremity was slightly weaker than the right. (R. at 236). Plaintiff had no sensory deficits, despite complaints of tingling in both hands. (R. at 236). Plaintiff's physical endurance was normal. (R. at 236). Basic cognitive processes were very functional, though there was difficulty with executive and cognitive functions. (R. at 236). Ms. Mioduszewski also found that Plaintiff's difficulty with impulse control was consistent with an individual suffering from

brain damage. (R. at 236). She recommended Plaintiff receive occupational therapy. (R. at 237).

Plaintiff was referred to Jonathan L. Costa, M.D., Ph.D., for a "physiatric" evaluation on June 1, 2007. (R. at 240). After examining Plaintiff Dr. Costa concluded that he suffered from multiple war-related closed head injuries and a left shoulder acromioclavicular ("AC") separation. (R. at 243). Dr. Costa also noted the presence of some degree of amnesia, ataxia[17], anosognosia[18], chronic pain, cognitive deficiency with behavior disorder, depression and episodic dyscontrol syndrome[19], post-concussive syndrome[20], sleep disturbance, cervical spine derangement with sprain/ strain, cervicogenic headache, and thoracic spine sprain/strain. (R. at 243). Dr. Costa opined that certain of Plaintiff's psychiatric medications might have been contributing to his cognitive defects and episodic dyscontrol. (R. at 243). He recommended changes in Plaintiff's regimen of medications - suggesting Plaintiff cease taking Depakote and Zoloft and continue with Prozac. (R. at 243). It was further recommended that Plaintiff's medical regimen include Zyprexa[21], Celexa, and Provigil[22] as alternative means of controlling his

---

[17]

"Ataxia describes a lack of muscle coordination during voluntary movements, such as walking or picking up objects." *MayoClinic.com*, http://www.mayoclinic.com/health/ataxia/ DS00910 (last visited September 13, 2010).

[18]

Anosognosia, generally, is the inability to recognize portions of one's own body, or physical deficits or paralysis in portions of one's own body. *The Merck Manual* 1785 (18th ed. 2006).

[19]

Episodic dyscontrol syndrome - intermittent explosive disorder "is marked by sudden, unpredictable acts of violent, aggressive behavior in otherwise normal persons." *MedicineOnline*, http://www.medicineonline.com/articles/E/2/Episodic-Dyscontrol-Syndrome/Intermittent-Explosive-Disorder.html (last visited September 13, 2010).

[20]

"Post-concussive syndrome is a complex disorder in which a combination of post-concussion symptoms - such as headaches and dizziness - last for weeks and sometimes months after the injury that caused the concussion." *MayoClinic.com*, http://www.mayoclinic.com/ health/post-concussion-syndrome/DS01020 (last visited September 13, 2010).

[21]

"Zyprexa is a psychotropic agent that belongs to the thienobenzodizepine class." *Physician's Desk Reference* 1830 (61st ed. 2007). "Zyprexa is indicated for the treatment of schizophrenia . . . [and] bipolar disorder." *Id.* at 1831.

[22]

"Provigil is a wakefulness-promoting agent for oral administration." *Physician's Desk Reference* 988 (61st ed. 2007).

13

PTSD and depression effectively. (R. at 244). Dr. Costa also advised Plaintiff to get an orthopedic evaluation for his left shoulder and physical therapy for his neck. (R. at 244).

Plaintiff received a neuropsychological evaluation from Michael Schwabenbauer, Ph.D. on June 4, 2007, to assess Plaintiff's cognitive and behavioral functioning. (R. at 246). Dr. Schwabenbauer found Plaintiff to be alert and oriented during the evaluation. (R. at 248). Plaintiff's verbal intellectual resources were in the high-average range; Plaintiff's verbal working memory was in the low-average range; intellectual testing measures indicated Plaintiff was in the average/ high-average range; Plaintiff's executive functioning was within expected limits; Plaintiff's word fluency was average; Plaintiff's verbal and visual recall were in the average range; repetition improved Plaintiff's recall significantly; Plaintiff's oral language was fluent, prosodic, and adequate in volume; Plaintiff's comprehension was functional for conversational purposes; Plaintiff exhibited no word-finding difficulty as earlier reported; and, he exhibited no visual construction difficulties which would indicate mental disturbance. (R. at 248).

Dr. Schwabenbauer opined that a personality assessment of Plaintiff showed performance consistent with Plaintiff's personal belief that he was suffering from severe psychological stress and had no resources to cope with such distress; however, this personal belief was not an accurate reflection of reality. (R. at 249). Dr. Schwabenbauer concluded that Plaintiff did not suffer from any significant cognitive dysfunction. (R. at 249). Plaintiff's intellect, memory, language, perception, and attentional processing fell within average ranges and were fairly well-preserved. (R. at 249). He did not find slowness in processing speed or other indicators of traumatic brain injury. (R. at 249). The objective testing did indicate, however, that Plaintiff likely suffered from intense anxiety, PTSD, and depression. (R. at 249). He noted that Plaintiff's symptoms appeared to be fairly well-controlled by medication. (R. at 249). Dr. Schwabenbauer stated that Plaintiff would likely benefit from stress management therapy, continued group therapy at the V.A. hospital, and psychiatric treatment for depression. (R. at 249).

*D. RFC Assessments*

An RFC assessment of Plaintiff's left shoulder and carpal tunnel syndrome was completed by 'Nghia Van Tran, M.D., on June 5, 2007. (R. at 250 - 256). Dr. Van Tran reviewed

14

Plaintiff's medical record and concluded that he had medically determinable impairments of left shoulder arthritis and carpal tunnel syndrome in both hands. (R. at 255). Dr. Van Tran determined that Plaintiff could still lift twenty pounds occasionally and ten pounds frequently. (R. at 251). Plaintiff also was found able to stand at least six hours, sit about six hours, and push or pull without limitation in an eight hour workday. (R. at 251). No other limitations were noted in the RFC assessment. (R. at 250 - 254).

Plaintiff's statements concerning limitations in daily functions were found to be only partially credible. (R. at 255 - 256). Specifically, Dr. Van Tran found that although Plaintiff claimed his left shoulder was injured in Iraq in 2003, and re-injured during combat training in 2006, radiology tests on his shoulder showed only normal to mildly abnormal results. (R. at 255). Plaintiff also did not take pain medication. (R. at 255). Dr. Van Tran determined that past physical examinations of Plaintiff's left shoulder revealed no deformities, some tenderness on palpitation, shoulder flexion of 180 degrees, shoulder abduction of 140 degrees, internal rotation to L3, external rotation of 80 degrees, and some tenderness on abduction. The evaluations also revealed normal neurology results, normal gait and station, and normal bilateral hand grip. (R. at 255). With respect to his carpal tunnel syndrome, physical examination of Plaintiff's wrist flexion was normal. (R. at 255). Plaintiff's grip strength was also normal, and neurology exams were relatively unremarkable. (R. at 255).

A State Agency consultant, Richard A. Heil, Ph.D., performed a mental RFC assessment on June 21, 2007. (R. at 357). In his assessment, Dr. Heil found that Plaintiff was moderately limited in his ability to remember locations and work-like procedures, understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, and work in coordination with or proximity to others without being distracted. (R. at 355). Dr. Heil also determined that Plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 356). Additionally, Plaintiff would be moderately limited in his ability to interact appropriately with

the general public, respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (R. at 356).

Dr. Heil summarized his findings by concluding that neither Plaintiff's long-term or short-term memory were significantly impaired; Plaintiff could understand, retain, and follow simple job instructions; Plaintiff could carry out very short and simple instructions; Plaintiff could maintain concentration and attention for long periods; Plaintiff could maintain regular attendance; Plaintiff could maintain socially appropriate behaviors and maintain himself; and, Plaintiff could function in production-oriented jobs requiring little independent decision-making. (R. at 356). As such, Dr. Heil determined Plaintiff could hold competitive employment on a sustained basis. (R. at 356).

On June 8, 2008, Ms. Watt conducted an updated mental RFC assessment of Plaintiff. (R. at 381). She indicated that Plaintiff had Major Depression characterized by anhedonia, appetite disturbance, sleep disturbance, psychomotor agitation, decreased energy, feelings of worthlessness, difficulty concentrating or thinking, and thoughts of suicide. (R. at 378). Ms. Watt indicated that Plaintiff had marked restriction of activities of daily living, marked difficulty in maintaining social functioning, marked difficulty in maintaining concentration, persistence, or pace, and, repeated episodes of decompensation. (R. at 379). He was also assessed as suffering from an anxiety disorder due to generalized persistent anxiety accompanied by autonomic hyperactivity, apprehensive expectation, and vigilance and scanning. (R. at 382). Plaintiff also had recurrent and intrusive recollections of traumatic experiences, resulting in marked distress. (R. at 382).

Plaintiff's abilities in the following areas were marked as 'Poor' by Ms. Watt:

1. Relate to co-workers;
2. Deal with the public;
3. Interact with supervisors;
4. Deal with work stress in the usual work setting;
5. Maintain attention/concentration;
6. Understand, remember and carry out complex job instructions;
7. Understand, remember and carry out detailed, but not complex job instructions;
8. Maintain personal appearance;

16

9.    Behave in an emotionally stable manner; and,
10.   Demonstrate reliability.

(R. at 380 - 81).

*E. ALJ Hearing*

Plaintiff testified that he graduated high school and had completed several semesters at Edinboro University in pursuit of a criminal justice degree. (R. at 28). While attending school, Plaintiff worked at a local Wal-Mart as a snack bar assistant. (R. at 31). He maintained a commercial driver's license and regular driver's license. (R. at 29 - 29). Plaintiff served as a military policeman in the army. (R. at 29). Outside the army, he had worked as a commercial truck driver and security guard/investigator. (R. at 30).

In 2006, Plaintiff attempted to complete officer training school, but was unable to finish. (R. at 33). He was dismissed from the program because he was confrontational and argumentative with the instructors. (R. at 43). Plaintiff felt the instructors were teaching the subject matter of various courses improperly. (R. at 43 - 44). Plaintiff often was reprimanded for his behavior. (R. at 45). Plaintiff testified that as a result of his physical condition he was limited in his ability to complete drills and exercises properly. (R. at 45). Overall, Plaintiff believed that he had not been a team player, and he had not fit in. (R. at 45). Plaintiff stated that while at training, his anger, concentration difficulties, and headaches became progressively worse; however, these conditions were not as bad as they became subsequent to leaving officer training. (R. at 46).

Plaintiff claimed he suffered from anger management problems. (R. at 31). He believed his anger had forced him to quit past employment. (R. at 32). Plaintiff's anger had also soured his relationship with his wife. (R. at 32). There were times that he could not concentrate, and he suffered from severe headaches which required him to lie down or else he might "snap and throw things." (R. at 34). He became irritable like this every three days. (R. at 34). These spells could last a few hours or an entire afternoon, and prevented him from taking part in everyday activities. (R. at 34). The headaches often prohibit him from doing any type of work - he cannot even watch television or operate a computer. (R. at 40 - 41). They also make him irritable to the point

where he avoids all social activity. (R. at 41). Plaintiff claimed his irritability got so bad when around others that he once wanted to throw an individual off a bridge for taking his fishing spot. (R. at 46 - 47).

Plaintiff began vocational rehabilitation in 2007, and his therapists were not hopeful about his future employment prospects. (R. at 48). They recommended that he seek disability. (R. at 48). Plaintiff was placed on medications for his psychological issues, but at the time of the hearing his medications were not providing him with much relief. (R. at 49). Plaintiff claimed that he suffered side effects from his medications and he often could not get out of bed. (R. at 40 - 50). He has been fully compliant with his medication regimen. (R. at 50 - 51).

Plaintiff testified that his left shoulder and hands gave him difficulty. (R. at 35). While serving in Iraq, a Humvee accident caused him to hit the dashboard of the vehicle and injure his left shoulder. (R. at 35). An orthopedic doctor in Erie informed him that he was a candidate for shoulder replacement, but that he was too young. (R. at 35). The doctor told Plaintiff that he would just have to deal with the pain. (R. at 35). When he sought second opinions in Pittsburgh, the Pittsburgh doctors could find nothing wrong with his shoulder. (R. at 35). Yet, Plaintiff also stated that testing conducted at some point had found a pinched nerve in his spine that was causing his shoulder pain. (R. at 35 - 36).

Plaintiff's shoulder pain prevented him from lifting his left arm, and his pain had been so bad that he once went to a hospital to get pain medication. (R. at 36). As a result of his left shoulder, he did not use his left arm much, and avoided picking up objects with it. (R. at 37).

With respect to his hands, Plaintiff claimed that he experienced uncomfortable swelling and numbness. (R. at 35). Numbness was particularly pronounced when he was using his hands consistently, such as with typing or writing. (R. at 38). As a result, Plaintiff often drops things. (R. at 37). Holding objects often give him the feeling of being electrically shocked, which in turn force him to let go of whatever he is holding. (R. at 37). Plaintiff has not received treatment for his hands. (R. at 39).

As a result of his psychological and physical condition, Plaintiff has given up all pleasurable activities and hobbies. (R. at 51 - 52). His interactions with others in public were

limited mostly to helping his wife with grocery shopping. (R. at 52).

A vocational expert, Ms. Kurtanich, testified regarding the availability of employment for a hypothetical person limited to: light work activity that is simple and repetitive in nature involving routine work processes and settings not involving teamwork; activities involving no more than incidental interaction with the public; activities not involving high stress - high stress being defined as high quotas or close attention to quality production standards; and, activities not involving overhead reaching or lifting with the left, non-dominant arm as an integral part of the job. (R. at 54). Ms. Kurtanich stated that a hypothetical person of Plaintiff's age, education, work experience, and limitations had a variety of employment options available. (R. at 54). The person could work as a warehouse checker, with 100,000 positions in the national economy; could work as a ticket taker, with 105,000 positions in the national economy; and could work as a ticketer, with 160,000 positions in the national economy. (R. at 54).

The ALJ asked Ms. Kurtanich what would be available if the hypothetical person was further limited to only sedentary work. (R. at 54). Ms. Kurtanich testified that such a person could work as a surveillance system monitor, with 230,000 positions in the national economy; a document preparer, with 200,000 positions in the national economy; and a ticket check, with over one million positions in the national economy. (R. at 55). These jobs could be completed sitting or standing. (R. at 55). According to Ms. Kurtanich, the hypothetical person would not have job opportunities available if he was unable to report for work or would have to leave work on an irregular basis three or more times per month; if he would be off task fifteen percent of the work day; if he would react inappropriately to supervision by either ignoring supervisors or reacting negatively to supervision; or, if once a week he would have difficulty concentrating for about two hours at a time. (R. at 55 - 56).

## IV.   STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by

statute. 42 U.S.C. §§ 405(g)[23] and 1383(c)(3).[24] Section 405(g) permits a district court to review transcripts and records upon which a determination of the Commissioner is based.

The district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court

---

[23]

Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[24]

Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

must review the record as a whole. *See* 5 U.S.C. §706.

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986).

The ALJ must utilize a five-step sequential analysis when evaluating the disability status of each claimant. 20 C.F.R. §404.1520. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404 subpt. P., appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiffs's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

## V.    DISCUSSION

Plaintiff argues that the ALJ failed to account adequately for the severity of his physical limitations resulting from a left shoulder injury and carpal tunnel syndrome, and the psychological limitations stemming from depression and post-traumatic stress disorder. (*Id.*). Defendant responds that the ALJ's determination was supported by substantial evidence; the ALJ assessed the credibility of Plaintiff's subjective complaints, and adequately discussed and relied upon the findings of medical professionals' conclusions in the record. (Docket No. 12 at 9 - 13).

*A. Treatment Notes and Physicians' Opinions*

Plaintiff's first objection to the ALJ's decision is that the ALJ failed to consider properly the opinions of Plaintiff's treating physicians and other medical personnel respecting Plaintiff's physical and psychological limitations. (Docket No. 8 at 3 - 9). Had the ALJ properly considered the entire record, Plaintiff asserts he would be entitled to DIB. (*Id.*).

Defendant counters that the ALJ relied upon, and gave the greatest weight to, the opinions and findings of actual physicians and other medical personnel who were entitled to some degree of deference when making limitations findings. (Docket No. 12 at 10 - 14). Defendant asserts that Plaintiff would rather the ALJ have favored the opinions of medical personnel who were not "acceptable medical source[s]" under 20 C.F.R. § 404.1513. (*Id.*). Instead, the ALJ accounted for and properly relied upon the opinions of acceptable medical sources when rendering his decision. (*Id.*). Further, Defendant claims that Plaintiff has not demonstrated how the ALJ's RFC assessment failed to accommodate Plaintiff's medically determinable limitations, and also did not provide examples of objective medical evidence sufficient to contradict the findings of the physicians upon which the ALJ relied. (*Id.*).

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)); *see also Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008); *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987); *Allen v. Bowen*, 881 F.2d 37, 41 (3d Cir. 1989); *Podedworney v. Harris*, 745 F.2d 210, 217-18 (3d Cir. 1984). And reports from consulting physicians who have examined the claimant and rendered assessments on conditions within their respective area of expertise are to be given appropriate evidentiary weight, which will vary based on the circumstance and the other medical evidence presented. *Gordils v. Secretary of Health and Human Services*, 921 F.3d 327, 328 (1st Cir. 1990) (citing *Rodriguez v. Secretary of Health and Human Services*, 647 F.2d 218, 223 (1st Cir. 1981) (weight to be afforded a consulting/examining physician's report "will vary with the circumstances, including the nature of the illness and the information provided the expert."). For example,

where the consulting/examining physician's report constitutes the only probative medical evidence on the condition in question, it may be entitled to great or even controlling weight. *See Reid v. Chater*, 71 F.3d 372, 374 (10th Cir. 1995) (examining physician's report accorded significant weight where it was the only medical assessment on point and corroborated by other evidence). Similarly, examining physician's reports that rest on objective clinical test results may be entitled to significant or controlling weight. *See Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

While it is not expected that the ALJ's explanation match the rigor of the "medical or scientific analysis" a medical professional might provide in justifying his or her decisions, when rejecting a treating physician's findings or according such findings less weight, the ALJ must be as "comprehensive and analytical as feasible," and provide the factual foundation for his decision and the specific findings that were rejected. *Cotter*, 642 F.2d at 705. The explanation should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli*, 247 F.3d at 42. While the explanation need not reference every relevant treatment note in a voluminous medical record, the ALJ, as the factfinder, should consider and evaluate the medical evidence thoroughly. *Id.* In doing so the ALJ "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). Nor can he "substitute his lay opinion for the medical opinion of experts," or engage in "pure speculation" unsupported by the record. *Id.* at 318-19; *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

The ALJ concluded that objective testing of Plaintiff's physical ailments revealed his ability to do at least light work not requiring overhead reaching or lifting with his left arm. (R. at 16). The ALJ first looked to the results of diagnostic testing: on January 19, 2006, x-rays of Plaintiff's left shoulder were normal; in October of 2006, imaging of the left shoulder showed possible injury or degeneration of the joint, but the findings were largely unremarkable; nerve conduction studies of Plaintiff's arms for carpal tunnel syndrome on January 29, 2007 showed only minimal affliction; lumbar spine imaging in February of 2007 showed only minor abnormality; and, an MRI of Plaintiff's brain in June of 2007 had normal results. (R. at 16).

Also, occupational therapy records from May of 2007 showed Plaintiff's upper extremities were within functional limits. (R. at 16).

The examination undertaken in conjunction with the physiatric evaluation conducted by Dr. Costa affirmed the findings revealed by diagnostic testing. Dr. Costa found some abnormality in Plaintiff's left shoulder and cervical spine, but noted that he had very good musculature of his upper extremities, and his upper extremities were otherwise intact, with the exception of some pain and weakness in the left shoulder. (R. at 16). State agency physician Dr. Van Tran also indicated that Plaintiff's medical record showed the ability to perform a full range of light work. (R. at 16). The ALJ also noted Plaintiff's own report of daily activities which include independence in personal care and grooming, the ability to drive, the ability to ride a tractor and tend to a farm, and the ability to help his wife with grocery shopping. (R. at 16). The ALJ concluded that while Plaintiff had medically determinable shoulder and carpal tunnel impairments, the evidence of record showed these conditions were not so severe as to preclude Plaintiff from light work. (R. at 17).

The applicable standard requires the ALJ to support his findings with substantial evidence for his determination to be conclusive. *Ventura,* 55 F.3d at 901; 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. In his decision, the ALJ relied upon objective findings by medical sources and diagnostic medical testing, analyzed the significance of the evidence, and provided a sound factual foundation for his decision. *Cotter*, 642 F.2d at 705. Moreover, Plaintiff has not shown how the ALJ failed to accommodate his physical limitations, or failed to cite contradictory evidence that would support his contention that his physical limitations prevented him from working. As such, the ALJ's determination with respect to Plaintiff's physical limitations is supported by substantial evidence.

With respect to Plaintiff's psychological limitations, the ALJ relied almost exclusively on the report from the consultative evaluation conducted by Dr. Schwabenbauer. (R. at 13 - 15). The ALJ observed that based on neuropsychological testing, Dr. Schwabenbaur indicated that plaintiff did not exhibit significant cognitive dysfunction. (R. at 15). Dr. Schwabenbaur opined that Plaintiff's intelligence was average, his memory was above average, and his language,

perception, and attention were fairly well-preserved. (R. at 15). Dr. Schwabenbauer found no signs of traumatic brain injury, and Plaintiff showed no slowness in processing speed. (R. at 15). The ALJ indicated that Dr. Schwabenbauer noted that Plaintiff presented with significant complaints of depression and anxiety consistent with PTSD but that Plaintiff was responding well to his medication regime.   (R. at 15).

The ALJ further observed that Plaintiff's mental state could vary widely in response to environmental stressors, with plaintiff often becoming angry or argumentative. (R. at 13 - 15). The ALJ nevertheless found that Plaintiff was able to function independently, and his treating sources generally noted his ability to communicate and act appropriately. (R. at 13).  Even when Plaintiff voluntarily ceased taking his medications, his treating sources noted that at times he was alert, euthymic, had a wide range of affect, thought logically, and was relaxed, open, and appropriate. (R. at 15 - 16).  Thus, the ALJ reasoned that limiting Plaintiff to light work involving simple, repetitive tasks, routine work processes and settings, without the need for teamwork, no more than incidental interaction with the public, no high stress, no quotas, and no close attention to quality production standards, was sufficient to account for Plaintiff's psychological limitations. (R. at 14).

Plaintiff highlights a list of records that the ALJ did not explicitly analyze in his decision, and argues that based upon the failure to discuss these records - including the opinions of treating medical professionals and Plaintiff's GAF scores - the ALJ's determination was not supported by substantial evidence. (Docket No. 8 at 3 - 10).  Plaintiff notes the details of one of these records - the RFC assessment completed by Ms. Watt - as exemplifying why the medical record does not support the ALJ's determination. (*Id.*).  Defendant argues that Ms. Watt, a nurse practitioner, is not an "acceptable medical source" under 20 C.F.R. § 404.1513(a), and her limitation findings are not entitled to controlling weight. (Docket No. 12 at 14).

A medical source's opinion is necessary for an ALJ to determine medical impairments. 20 C.F.R.§ 404.1513(a).  "Acceptable medical sources" are limited to licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. *Id.*  Opinions and assessments from "other sources" may be used

to provide additional evidence about the symptoms, diagnoses, and prognoses of any impairments identified by acceptable medical sources. 20 C.F.R.§ 404.1513(d) ("Other sources" that may be used to show the severity of impairments include "nurse practitioners, physicians' assistants, neuropaths, chiropractors, audiologists, and therapists . . ."). Such sources may not be used to establish the existence of an impairment. *See Dougherty v. Astrue*, 2010 WL 2075875 at 2 (3d Cir. 2010) (chiropractor's decision "should not be given 'controlling weight' because . . . the opinion of a chiropractor is not an 'acceptable medical source' capable of establishing a determinable impairment").

Moreover, the Administration has promulgated Social Security Ruling 06-03p to better accommodate the way health care is administered and managed today. As another member of this court recently noted:

> Social Security regulations state that evidence of a claimant's impairment may be provided by "other" medical sources, including, among others, licensed clinical social workers and therapists. 20 C.F.R. § 404.1513(d). In the past, this evidence was given little weight compared to that provided by "acceptable medical sources." However, Social Security Ruling 06-03p, "Considering Opinions and Other Evidence from Sources Who Are Not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Non-governmental Agencies," reflects recent changes in how medical care is provided in this country. That is, managed health care and the emphasis on containing medical costs has resulted in medical sources such as nurse practitioners, physician assistants, and licensed clinical social workers assuming a greater percentage of the treatment and evaluation functions previously handled by physicians and psychologists. The opinions of these medical sources, although not technically "acceptable medical sources" under Social Security rules, are to be evaluated on key issues such as impairment severity and functional effects, although their opinions cannot establish the existence of a medically determinable impairment. The weight given to such evidence will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors. Furthermore, the opinions are to be evaluated using the same factors as those used in weighing the opinions of acceptable medical sources, e.g., how long the source has known and how frequently he has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well he explains his opinion; whether he has a specialty or area of expertise related to the individual's impairment(s); and any other factors that tend to support or refute the opinion. Finally, the ALJ's discussion of these opinions should include information about the weight given to them so subsequent reviewers may understand the ALJ's reasoning, particularly when those opinions may have an effect on the outcome of the case.

Smith v. Astrue, 2008 WL 4853757, * 7 n. 16 (W.D. Pa. November 6, 2008).

Against the above backdrop, it is clear that Dr. Schwabenbaur's report cannot carry the weight the ALJ assigned to it. It was based on a one-time neuropsychological consult that was designed to assess Plaintiff's cognitive and behavioral functioning. It did not speak to the other numerous aspects of the record highlighting the ramifications from plaintiff's poor emotional health that suggest or imply that plaintiff is disabled from the limitations produced by his mental health impairments. The record is replete with assessments by plaintiff's mental health service providers indicating that on numerous occasions plaintiff's psychological impairments produce disabling limitations notwithstanding ongoing treatment. A review of plaintiff's medications and the rather constant effort to adjust and vary them with only limited success further substantiates these mental health service providers' assessments. And when these aspects of the record properly are taken into account, a single consultative neuropsychological evaluation undertaken to assess plaintiff's cognitive and behavioral functioning does not supply substantial evidence to displace these assessments.

First, to the extent defendant takes the position that the ALJ was free to discount substantially the treating mental health providers, the position is contrary to the defendant's regulations and ruling on "other source" treatment providers and undermined significantly by the context surrounding plaintiff's course of treatment. As a veteran, plaintiff sought treatment at the VA Medical Center in Erie and was treated through a mental health care clinic conducted under the control of the VA. For over two years plaintiff was treated with a variety of psychotherapy sessions and a plethora of medication. His major depressive disorder, PTSD, hyper-vigilance and episodic dyscontrol syndrome repeatedly produced symptoms that were highlighted by an array of mental health providers, including a behavior science specialist, certified registered nurses, psychologists, a social worker and an occupational therapist. Each of these sources noted the ongoing fluctuations in plaintiff's emotional health and the symptoms that repeatedly manifest themselves. Each recorded their treatment and observations of plaintiff over the course of that treatment. Adjustments in plaintiff's medication regime were made based on this course of treatment.

The treating and prescribing physicians/psychiatrists obviously placed a great deal of

reliance on the mental health care providers at the clinic and made adjustments in plaintiff's treatment regime based on their competence and observations in providing treatment. To discount such assessments to the point where they virtually are cast aside because they are not the literal words of the treating physician fails to place these assessments in context and acknowledge the validity the actual doctors overseeing plaintiff's treatment at the VA clinic placed in them. Defendant's regulations on acceptable medical sources and other source providers do not sanction such an approach and we see no good reason to ignore the setting and context in which these assessments were rendered.

All treating sources noted or rendered assessments indicating plaintiff's poor emotional health was an impediment to his maintaining employment in a competitive environment. And these assessments were based on a longitudinal picture of plaintiff's emotional and psychological health.

Ms. Watt provided mental health treatment in the form of psychotherapy to Plaintiff from November 6, 2007 until at least the last session reflected in the record - February 26, 2008. (R. at 402, 415). These therapy sessions were completed prior to her RFC assessment on June 8, 2008. (R. at 381). As the most recent assessment of Plaintiff's ability to engage in substantial gainful employment, and considering her treatment history with Plaintiff, Ms. Watt's assessment has substantial probative value. Amongst the aforementioned limitations, Ms. Watt designated Plaintiff's abilities in the following areas as 'Poor':

1. Relate to co-workers;
2. Deal with the public;
3. Interact with supervisors;
4. Deal with work stress in the usual work setting;
5. Maintain attention/concentration;
6. Understand, remember and carry out complex job instructions;
7. Understand, remember and carry out detailed, but not complex job instructions;
8. Maintain personal appearance;
9. Behave in an emotionally stable manner; and,
10. Demonstrate reliability.

(R. at 380 - 81). These findings find overwhelming support from Plaintiff's many other *treating* sources. None were discussed by the ALJ in making his determination.

For example, no mention was made of Dr. Costa's findings regarding Plaintiff's mental health. The examination by Dr. Costa was completed only three days prior to the consultative examination by Dr. Schwabenbauer. In his examination, Dr. Costa noted numerous psychological conditions, including amnesia, anosognosia, cognitive deficiency with behavior disorder, depression and episodic dyscontrol syndrome, and PTSD, which persisted. (R. at 243-44). Dr. Costa further found that notwithstanding the many different medications and medication adjustments that had been implemented, Plaintiff's medication regimen might have in fact been harming Plaintiff's psychological state, and he recommended substantial changes to it. (R. at 243-44). In addition, Dr. Costa prescribed Zyprexa, a psychotropic agent for the treatment of schizophrenia and bi-polar disorder. The nature of the numerous psychological conditions highlighted by Dr. Costa and the need to drastically change plaintiff's medication regime speak volumes about the effectiveness of treatment up to that point and the need for additional measures to bring plaintiff's emotional health under control.

Moreover, at the outset both Mr. Steg and Ms. Teresi noted that Plaintiff's psychological state impeded, if not precluded, Plaintiff from being employed. (R. at 327, 348). Mr. Steg treated Plaintiff for PTSD, depression, and anxiety, all of which worsened when Plaintiff experienced difficulty with any aspect of his personal life. (R. at 322, 331). Ms. Teresi found Plaintiff to have difficulty controlling his mood and impulses, his cognition was often impaired, and his insight and judgment were limited. (R. at 327). Though Plaintiff's symptoms exhibited periods of stability, events in Plaintiff's personal life often made the efforts to stabilize the symptoms from his PTSD and depression difficult. (R. at 258, 263, 277, 294, 299, 308-18, 325). Similarly, Dr. Shreve reported excellent progress by Plaintiff until the news of Dr. Shreve's departure surfaced in September of 2006 and sent Plaintiff into a rapid downward spiral which Dr. Shreve described as regression. (R. at 426). Ms. Watt also found that Plaintiff's psychological condition fluctuated greatly depending on his personal circumstances. (R. at 402, 404, 407, 413-15).

Notes from other consultative examinations further corroborated these assessments. On May 31, 2007, Ms. MacIsaac noted memory loss, difficulty concentrating, and deficient problem-solving and reasoning. (R. at 231-32). Plaintiff had difficulty maintaining attention and coping

with distractions, and difficulty with planning, decision-making, time management, and organization. (R. at 232-33). On May 31, 2007, Ms. Mioduszewski noted that Plaintiff's visual motor assessment indicated personality disturbance, he had difficulty maintaining attention, he had a deficit in impulse control, he showed poor planning and organizational skills, was frustrated when completing tasks, and showed signs of aggressive thoughts. (R. at 235-36).

The seemingly constant search for an effective medication regime also corroborated the assessments by plaintiff's treating mental health providers. Plaintiff was on at least eleven different medications for varying time periods, at varying doses, during the two years of treatment at the VA clinic. There were numerous instances where treatment providers observed that medication was at best limited and often ineffective in bringing plaintiff's psychological health under control. Ms. Buzzard's observed that Plaintiff simply was not responding to these medications. (R. at 423). Ms. Teresi's treatment notes indicated that even when a medication change improved one of Plaintiff's many psychological conditions, others went unchanged or worsened. (R. at 258). Ms. Watt's treatment notes indicated that Plaintiff's anger remained uncontrolled and his medication needed some adjustment. (R. at 403-04, 414). Dr. Costa came to the conclusion that the medication therapy had not been effective and further significant changes should be tried.

At the very best, the record of Plaintiff's ongoing medical treatment strongly suggested that his psychological conditions and related symptoms were very difficult to control. At worst, it suggested that those conditions and symptoms were beyond a form of medical management that would make Plaintiff able to cope with the rigorous demands of substantial gainful activity.

Against this backdrop, the ALJ erred in using Dr. Schwabenbaur's assessment virtually as a basis to dismiss the treating mental health providers' assessments over a two year period. First and foremost, Dr. Schwabenbaur merely conducted "an initial neuropsychological consultation to determine [plaintiff's] current level of cognitive and behavior functioning." Neuropsychology is "[t]he branch of [clinical] psychology that deals with the relationship between the nervous system, especially the brain, and cerebral or mental functions such as language, memory, and perception." American Heritage Dictionary of the English Language,

30

http://education.yahoo.com/reference/dictionary/entry/neuropsychology. It is devoted to understanding how the brain and nervous system affect human functioning on a daily basis. Advanced Psychological Assessment, P.C.,

http://www.advancedpsy.com/1_what_is_neuropsychology-page-3.html. A clinical neuropsychologist has special expertise in the applied science of brain-behavior relationships. See National Academy of Neuropsychology, www.nanonline.org., http://199.73.206?NAN/Files/PAIC/PDFs/NANPositionDefNeuro.pdf. "The training that a neuropsychologist receives enables him or her to understand the test findings within the context of how the brain of the person who is being evaluated is functioning. This entails a detailed knowledge of brain anatomy, the roll that different brain areas serve and how these functions are likely to be impacted by various disorders such as Down's Syndrome, multiple sclerosis, brain tumors, ADHD, seizures and acquired brain injuries."

http://www.advancedpsy.com/1_what_is_neuropsychology-page-3.html.

Dr. Schwabenbaur's evaluation consisted of a battery of neuropsychological testing to measure cognitive, emotional and behavior functioning. The tests measured verbal and performance intelligence, verbal working memory and other measures of intellectual functioning such as processing speed, visuospatial processing, two-dimensional visuospatial processing, and higher levels of executive and memory functions. Oral language, repetition in word fluency, comprehension, word-finding and visual construction tasks also were tested. Plaintiff tested in the average to above-average percentiles in all of these areas.

Dr. Schwabenbaur conducted a clinical interview and received an oral history from plaintiff. He also conducted one test that would shed some light on plaintiff's emotional health: the Minnesota Multiphasic Personality Inventory - Second Edition. He reviewed service records reflecting plaintiff's tours of duty and records of plaintiff's treatment for depressive disorder and PTSD at the Erie V.A. Medical Center - specifically counseling "with Mr. Robert Martin." No mention was made of any of the treatment providers or the details of treatment outlined above.

As to emotional health, Dr. Schwabenbaur noted that the personality assessment revealed a pattern of performance consistent with a belief by plaintiff that he had a marked/severe degree

of psychological distress and the absence of resources to cope with that distress. Review from other parts of the examination indicated that plaintiff did have numerous resources to assist in coping with his psychological distress. As to plaintiff's actual emotional health, Dr. Schwabenbaur noted that plaintiff "does acknowledge marked feelings of depression and anxiety."

Dr. Schwabenbaur's conclusions were that plaintiff did not present with any significant cognitive dysfunction and the test findings "do not appear consistent with those frequently seen following traumatic brain injury. In contrast, he does present with significant complaints of depression and anxiety, including mood disturbance, traumatic recollections, and emotional dyscontrol." R. 249. Testing also confirmed "fairly intense feelings of anxiety." R. 249. Dr. Schwabenbaur's diagnosis was PTSD. He was under the impression that plaintiff was responding to the medication prescribed and had fairly clearly defined goals. R. 249. He recommended stress management techniques, ongoing group therapy and "a psychiatric referral as well, given his persistent complaint's of depression." R. 249. Thus, far from discounting or undermining the significance of and potential limitations from Plaintiff's poor emotional health, Dr. Schwabenbaur actually corroborated the existence of the same impairments and recommended ongoing treatment for the symptoms from them.

Dr. Schwabenbaur's examination and assessments cannot bear the weight the ALJ assigned to them. The testing and assessments were primarily aimed at assessing plaintiff's cognitive levels of functioning and established a point verified in other parts of the record: plaintiff did not present with symptoms consistent with traumatic brain injury. His levels of cognitive functioning, verbal and performance intelligence, word fluency, memory recall, and processing speed were average to above average. Plaintiff's treating mental health providers did not base the vast majority of their assessments on perceived deficiencies in these areas or on the presence of numerous symptoms that would be suspected to be caused by traumatic brain injury.

In contrast, Dr. Schwabenbaur's assessments as to plaintiff's emotional health were quite consistent with both the symptoms observed by the mental health providers and their assessments of plaintiff's psychological/emotional health. He reported that plaintiff presented with PTSD,

depressive disorder, anxiety, mood disturbance, traumatic recollections, and emotional dyscontrol. His recommendations for introduction to stress management techniques, group therapy and a psychiatric referral fall far short of suggesting that plaintiff's numerous symptoms from his poor emotional health were controlled to the point that he could handle the stressors and rigor of the workplace as limited by the ALJ's RFC assessment. And any doubt about the impact that properly could be assigned to Dr. Schwaberbaur's assessments in this area must be tempered by his understanding that plaintiff's emotional health was responding well to medication, a proposition that Dr. Costa had obliterated just three days prior to Dr. Schwaberbaur's one-day consultative examination after an examination and review of the two years of treatment at the clinic.

It is well-settled that an ALJ is not free to rely on a few isolated and selective excepts from the medical evidence to inform his assessment of a plaintiff's residual functional capacity. See Kent, 710 F.2d at 114 (A single piece of evidence is not substantial where it is overwhelmed by other evidence or if it is not evidence but mere conclusion.); Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981) ("Substantial evidence can be considered as supporting evidence only in relationship to all the other evidence in the record."). The ALJ's efforts to extrapolate from Dr. Schwaberbaur's report a sound basis for discounting the specific assessments made by Plaintiff's treating mental health providers lacks a logical foundation. And given the corroborating medical and other information contained in the treating records, it is clear that the ALJ's rejection of Plaintiff's therapists, counselors, medication management nurses and treating psychiatrist's assessments in such a wholesale manner cannot stand.

*C. Subjective Complaints*

The ALJ also erred in failing to give plaintiff's report of mental and emotional limitations adequate consideration and weight in evaluating the record, and in dismissing them based only upon the findings of Dr. Schwabenbauer and statements Plaintiff made about his daily activities. The Act recognizes that under certain circumstances the subjective reporting of limitations may in itself may be disabling:

> [a]n individual's statement as to pain or other symptoms shall alone not be conclusive evidence of disability ...; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that result from anatomical, physiological or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under disability.

42 U.S.C. § 423 (d)(5)(A); *Green v. Schweiker*, 749 F.2d 1066 (3d Cir. 1984). The United States Court of Appeals for the Third Circuit has set forth a four-prong standard to be used by district courts when reviewing assessments of the Commissioner based on subjective reports of significant limitations: (1) subjective complaints are to be seriously considered, even where not fully confirmed by objective medical evidence; (2) subjective complaints may support a claim for disability benefits and may be disabling; (3) when such complaints are supported by medical evidence, they should be given great weight; and finally, (4) where the claimant's testimony about the reported limitation is reasonably supported by medical evidence, the ALJ may not discount the limitation without contrary medical evidence. Ferguson v. Schweiker, 765 F.2d 31 (3d Cir. 1985).

In evaluating such limitations, an ALJ must accord subjective complaints the same treatment as objective medical reports, in that he must weigh all the evidence before him and explain his or her reasons for crediting and/or rejecting such evidence. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 122 (3d Cir. 2000). In doing so serious consideration must be given to subjective complaints where a medical condition exists that could reasonably produce such complaints. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993). When medical evidence provides objective support for the subjective complaint, the ALJ can only reject such a complaint by providing contrary objective medical evidence. *Mason*, 994 F.2d at 1067-68. And "in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence,

including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work." *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999) (citing S.S.R. 95-5p at 2 (1995)).

In his decision, the ALJ glossed over Plaintiff's subjective complaints, summarily rejecting them merely by citing the findings of Dr. Schwabenbauer and some of Plaintiff's own statements regarding his daily activities. (R. at 13 - 15). The ALJ further attempted to discount Plaintiff's description of his limitations by citing Plaintiff's statements that before his poor emotional health, he enjoyed horseback riding, motorcycle riding, video games, and sky diving. (R. at 16 - 17). Yet the ALJ failed to explain how Plaintiff's former hobbies, as well as his ability to dress himself, perform household chores, and help his wife shop for groceries undermined in any meaningful way the limitations repeatedly noted to be caused by his PTSD, depression, anxiety and episodic dyscontrol syndrome.

Plaintiff's claim that his anger-management issues inhibited his ability to find and maintain suitable employment is corroborated by the objective medical evidence. His claims of an inability to concentrate and irritability that often rendered him incapable of taking part in daily activities also is supported by the objective medical evidence. Plaintiff's claim that his medications provided him with little relief was well supported. The treating mental health providers' notes were replete with references to these and similar symptoms and limitations. The basic activities of daily living and reference to once-enjoyed hobbies hardly can be said to provide sufficient counter medical evidence to discount plaintiff's testimony. In all, as with the objective medical evidence, the weight of the subjective evidence supports the view that plaintiff was disabled within the meaning of the Act. The ALJ presented little to contradict this evidence. As such, there was not substantial evidence to discount Plaintiff's subjective accounts in such a manner.

**VI.    CONCLUSION**

Based upon the foregoing, it is clear that the ALJ provided substantial evidence to support his determination that Plaintiff's physical limitations did not preclude him from performing light work. The evidence referenced by the ALJ in support of his assessment of Plaintiff's psychological impairments and the degree and impact the limitations therefrom have on Plaintiff's ability to engage in substantial gainful activity was taken out of context and unsupported extrapolations were drawn therefrom.

A reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence as a whole indicates that the plaintiff is disabled and entitled to benefits." *Podedworney v. Harris*, 745 F.2d 210, 222 (3d Cir. 1984). The record comes very close to satisfying this standard. Nevertheless, Plaintiff suffers from psychological impairments that were believed to be susceptible to control through treatment and medication. Furthermore, during treatment Plaintiff experienced some upturns in mood and functionality and there is little evidence about the likely duration of Plaintiff's poor emotional health at any given time or whether his PTSD, major depressive disorder, anxiety disorder and episodic dyscontrol syndrome are or should be recognized as recurrent and systemic. In addition, the ALJ did not make thorough findings about the impact of the consistent limitations produced by Plaintiff's psychological impairments and examine in detail the treating mental health providers' assessments and observations in accordance with the standards in 06-03p. Nor did he discuss and make findings about Plaintiff's medication regime and the persistent need to make adjustments to that regime. Given this lack of completeness in the administrative record, it is inappropriate to award benefits at this juncture.

In light of the above, Plaintiff's Motion for Summary Judgment will be granted; Defendant's Motion for Summary Judgment will be denied; the decision of the Commissioner will be vacated and the matter will be remanded for further proceedings consistent with this opinion. Appropriate orders will follow.

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

36

cc: Terry K. Wheeler, Esq.
56 Clinton Street
Greenville, PA 16125
(724) 588-1441

Jessica Smolar, Esq.
United States Attorney's Office
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
(412) 644-3500